**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No. 1:22-CR-62-HAB |
| | ) | |
| CARWIN HOLLEY-CHAMBERS | ) | |

**OPINION AND ORDER**

Defendant was pulled over in October 2022. A resulting pat-down search uncovered a firearm and ammunition. This was problematic given Defendant's prior felony conviction, resulting in his instant charge under 18 U.S.C. § 922(g)(1).

Defendant now moves to suppress the firearm and ammunition, arguing that the officers lacked a factual basis to perform the pat-down search. The Court held an evidentiary hearing in March of this year, and the motion is now fully briefed (ECF Nos. 37, 38, 40). Because the Court agrees with Defendant that officers did not have reasonable suspicion to believe that he was armed and dangerous, and because the Court also agrees with Defendant that inevitable discovery does not apply, the motion will be granted.

**I.      Factual Background**

Officer Michael Diaz ("Diaz") of the Fort Wayne Police Department ("FWPD") was working the overnight patrol shift in Southeast Fort Wayne—a "high crime" area—when he observed, and then followed, a Jeep Wrangler driven by Defendant. Diaz used his car's speedometer to determine the Wrangler's speed. This technique showed that the Wrangler traveled at 31 miles per hour, before accelerating to 38 miles per hour, before finally settling at 34 miles per hour. All were above the posted 30 miles per hour speed limit.

Diaz decided to pull the Wrangler over for the speeding violation. While speaking with the driver, later identified as Defendant, Diaz noticed a digital scale in the driver's door pocket. Diaz asked Defendant for his driver's license and, because the Wrangler was a rental, a copy of the rental agreement. Defendant provided both.

Returning to his vehicle, Diaz ran Defendant's name through his in-car Spillman computer system. FWPD officers routinely use Spillman to obtain background information on suspects, including license status, criminal history, and outstanding warrants. A check of Defendant's name showed safety alerts for "convicted felon" and "party armed," as well as prior police encounters and drug trafficking arrests. Of apparent note to Diaz, Spillman showed that Defendant had previously been denied a firearms permit, had been charged with two counts of dealing cocaine, was a former federal inmate, had been a suspect in a fight more than a year prior, and had been a suspect in a fight involving an armed party three months before that.

As Diaz prepared the speeding citation, FWPD Officers Lucas Hayes ("Hayes") and Gynn arrived. Diaz requested that the two officers conduct a pat-down search of Defendant, stating, "take him out and pat him down, too. I don't care." Hayes and Gynn complied, with Hayes ordering Defendant out of the vehicle and instructing Gynn to perform the pat-down.

According to the Government, "[w]hen Holley-Chambers exited the vehicle, his hand reached for his pocket, at which point Ofc. Hayes became concerned that he could be reaching for a weapon." (ECF No. 38). The Court has reviewed the body-cam footage of the stop and cannot agree with this characterization. Defendant did have his hands in his jacket pockets as he exited the vehicle, but no "reaching" occurred. Nor did Hayes appear "concerned." Rather, he calmly asked Defendant to take his hands out of his pockets, and Defendant calmly complied. Gynn then went immediately into the pat-down search, where the firearm and ammunition were found.

2

FWPD Officer Jason Fuhrman ("Fuhrman") also reported to the scene of the stop with his K9 partner, Lobo. With Defendant already out of the Wrangler, Lobo searched the interior of the vehicle, alerting to the presence of narcotics in the center console of the vehicle. Diaz searched the area where Lobo alerted but found no drugs. Diaz did testify that he observed a "white, powdery residue" on the digital scale during the search that he believed to be cocaine, but no confirmatory tests were conducted on the substance and Defendant was never charged with cocaine possession.

## II.      Legal Analysis

### A.      *Officers Lacked Reasonable Suspicion to Conduct a Pat-Down Search*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop is governed by the principles established in *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny. Under *Terry*, a police officer may perform an investigative stop when there is reasonable suspicion, based on specific and articulable facts, that "criminal activity may be afoot." *Terry*, 392 U.S. at 30, 88 S.Ct. 1868. Whether there is reasonable suspicion is determined based on the totality of the circumstances. *See United States v. Sokolow*, 490 U.S. 1, 8 (1989).

The scope and duration of a traffic stop are limited to what is necessary to fulfill the purpose of the seizure. *See Florida v. Royer*, 460 U.S. 491, 500, (1983) (plurality); *United States v. Finke*, 85 F.3d 1275, 1278 (7th Cir. 1996). "The scope of the detention must be carefully tailored to its underlying justification." *Royer*, 460 U.S. at 500. But when there is reasonable suspicion that the occupants of a vehicle are engaged in other illegal activity, an officer may prolong a traffic stop to investigate that activity. *Finke*, 85 F.3d at 1275.

Defendant does not challenge the basis for the stop (but more on that later), and only mentions the duration of the stop in passing in his reply brief. Instead, he argues that the officers

lacked reasonable suspicion to believe that he was armed and dangerous, rendering the pat-down search constitutionally infirm.

The Fourth Amendment permits officers to order drivers and passengers out of a car during a traffic stop to ensure officer safety. *See Maryland v. Wilson*, 519 U.S. 408, 413–15 (1997). But "[t]he power to conduct a *Terry* stop does not automatically give police the power to frisk the subject for weapons." *United States v. Howard*, 729 F.3d 655, 662 (7th Cir. 2013) (citing *Terry*, 392 U.S. at 27). "To justify a patdown of the driver or a passenger during a traffic stop, . . . the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). On the other hand, an officer need not be sure that a person is hiding a weapon rather than drugs or other contraband before performing a pat-down. *See United States v. Ford*, 872 F.3d 412, 414–15 (7th Cir. 2017) ("Certainty about the presence of a weapon is unnecessary; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.") (internal quotation marks omitted).

Reasonable suspicion of criminal activity cannot rest on a person's prior criminal record. See *United States v. Jerez*, 108 F.3d 684, 693 (7th Cir. 1997). Nor can criminal history alone constitute reasonable suspicion that an individual is armed and dangerous. *United States v. Walden*, 146 F.3d 487, 490–91 (7th Cir. 1998). On the other hand, a criminal record along with other information can establish a reasonable suspicion. *See United States v. Feliciano*, 45 F.3d 1070, 1074 (7th Cir. 1995).

The Government, relying on *Walden*, believes that this case has the "other information" that, coupled with Defendant's criminal history, supported the pat-down. In *Walden*, the "other information" was "officer safety alerts," — that Walden engaged in "gang crime activity" and was

4

"armed and dangerous." *Walden*, 146 F.3d at 491. These alerts, coupled with Walden's history of arrests for armed robbery and unlawful use of weapons, led the Seventh Circuit to conclude that an officer could "certainly believe that Walden posed a potential threat to him. It is eminently reasonable for an officer to suspect that an 'armed and dangerous' person would have a weapon." *Id*.

The Government points to several pieces of additional information that it claims supports reasonable suspicion here. The first are the safety alerts Diaz read on Spillman, which showed that Defendant was a "convicted felon" and "party armed." These alerts, particularly the "party armed," do bear a superficial similarity to the alerts in *Walden*. But the probative value of these alerts was undone by Diaz when, on cross-examination, he confirmed that the alerts are "taken from [Defendant's] criminal history." (ECF No. 36 at 40). Stated another way, the alerts are not additional information to Defendant's criminal history, but the same information entered into a different field. If Defendant's criminal history cannot create reasonable suspicion, then that history summarized and located on a different part of the screen adds nothing to the calculus.

The safety alerts are far from the only example where Diaz seeks to double up on reasonable suspicion by relying on the same information worded differently. When asked to identify items on the Spillman "involvements" page that he found "significant," Diaz pointed to "the denied handgun application, the previous ones for the accounts of dealing cocaine and then the multiple possession, federal inmate, the dealing in cocaine or narcotic drug jail bookings, as well as the suspect in the fight." (*Id*. at 25). Each of these items is either a re-phrasing of his criminal history (dealing and possession charges, federal inmate) or the result of his criminal history (the denial of the handgun application).

The Government next relies on the armed fight from June 2021 where Spillman listed Defendant as a "suspect." Relying on *Feliciano*, the Government asserts that "gang association and recent relevant criminal conduct 'is a permissible component of the articulable suspicion required for a *Terry* stop.'" (ECF No. 29 at 13). This quotation from *Feliciano* is correct, but it's hard to see how it helps the Government.

First, Defendant is not a known gang member, distinguishing this case from both *Walden* and *Feliciano*. But more importantly, Defendant does not have "recent criminal conduct."[1] The recent criminal conduct in *Feliciano* was that the defendant had "just been released from prison." *Feliciano*, 45 F.3d at 1072. The decision does not say how close in time the release was to the frisk, but the use of the term "just" indicates that it must have been close. The armed fight where, again, Defendant was only a "suspect," occurred ***sixteen months*** before the traffic stop. While that may be recent in a geological era sense, it's the distant past when evaluating evidentiary value. *See Owens v. United States*, 387 F.3d 607, 608 (7th Cir. 2004) (three-month-old sale of drugs too stale to support a finding of probable cause for a search).

The Government further argues that Diaz's observation of the digital scale, "which in his experience was one he recognized as commonly used by drug users and traffickers," could give rise to reasonable suspicion. (ECF No. 38 at 12). The Government fails to cite a single case in which a digital scale, alone or together with other factors, was found to support reasonable suspicion for a pat-down search. The Court has conducted its own research of Seventh Circuit case law (both circuit and district court cases) and it, too, has come up empty.

---

[1] At base, the Court questions the distinction between "criminal history," which cannot independently create reasonable suspicion, and "recent criminal conduct," which can tip the scale in the Government's favor. Taking *Feliciano* as an example, the Court can think of no good reason why a suspect's conviction for robbery doesn't provide reasonable suspicion that he is armed, but his recent release from jail for that crime does. *See Feliciano*, 45 F.3d at 1072. This strikes the Court as the same category of evidence as the safety alerts—criminal history in a Groucho Marx glasses-and-mustache disguise.

The Court believes it can explain the lack of case law supporting the Government's position. As Diaz acknowledged during the hearing, there are multiple legal uses for a digital scale.[2] Any connection to drugs, then, is a supposition on Diaz's part. And even then, as the Government concedes, it could be related to drug use rather than trafficking, so to get to drug dealing requires another supposition. But because that only gets you to drugs, there needs to be another supposition of drug-related firearm possession. That's three levels of attenuation from facts, and the Court finds such attenuation to be too big a leap. *See United States v. Moody*, 915 F.3d 425, 430 (7th Cir. 2019) (citing *United States v. Green*, 360 Fed. App'x 521, 522–25 (5th Cir. 2010)).

Diaz also pointed to Defendant's use of a rental vehicle as suspicious because, in his training and experience, drug traffickers use rental cars "due to their lack of equipment violations and anonymity[3] they provide the driver." (ECF No. 38 at 12). Diaz's assertion barely passes the giggle test. Among the various reasons someone might rent a car, drug trafficking trails vacation and having a car in the repair shop by several standard deviations. That Diaz would highlight such an innocuous fact as a basis for suspicion indicates, at least to the Court, that he and the Government are desperate.

But more importantly, if the Court accepts that driving a vehicle without equipment violations is enough to raise reasonable suspicion of drug trafficking, and by extension gun possession, than *anything* suffices so long as the testifying officer uses the magic "training and experience" language. A suspect is going the speed limit? That's what drug traffickers do when

---

[2] The Court also notes that Diaz does not mention the digital scale as a basis for the pat-down in any of the Government-provided body cam videos.

[3] The Court doesn't know when Diaz last rented a car, but the process requires a valid, government-issued driver's license and a written contract between the driver and the rental company. True, the car isn't registered to the driver, but it's far from an anonymous transaction.

they don't want to arouse suspicion. Has a valid license and registration? Same. Is calm and pleasant with officers during the stop? Drug traffickers become desensitized to police contacts. Speaks Spanish? Many members of Mexican drug cartels are known to speak languages other than English. The Court could go on listing absurd examples, but it will struggle to find one as absurd as driving a rental vehicle.

Finally, the Government points to the late hour and the "high crime" area where the stop occurred. The Court concedes that these can be factors supporting reasonable suspicion. *See United States v. Brown*, 273 F.3d 747, 748 (7th Cir. 2001). But, as set forth below, the Court discounts those factors completely here.

In his concurring opinion in *Terry*, Justice Harlan made clear that the right to frisk first depends on the reasonableness of initial stop.

> Any person, including a policeman, is at liberty to avoid a person he considers dangerous. If and when a policeman has a right instead to disarm such a person for his own protection, he must first have a right not to avoid him but to be in his presence. That right must be more than the liberty (again, possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away; he certainly need not submit to a frisk for the questioner's protection.

*Terry* 392 U.S. at 32–33. And while no one doubts the constitutionality of Diaz's stop, his choice to make that stop when and where he does necessarily colors the Court's analysis.

If Diaz was truly concerned about the time and location of the stop, he had the choice not to make it. This is not a situation where Defendant was independently suspected of a crime, or Diaz had reports of a suspicious vehicle, or any other situation where Defendant and his vehicle deserved additional scrutiny. Instead, Defendant's "crime" was to drive four miles an hour over the speed limit. The Court would bet dollars to donuts that Diaz sees, and ignores, this very violation dozens of times every shift. Otherwise, Diaz would do nothing other than write speeding

tickets/warnings. What Defendant did was "illegal" only in the strictest sense, and no one can reasonably argue to the contrary.

That Diaz chose to make the stop when and where he did, and for the most minor of offenses, is far more probative of his perception of the danger posed than anything he said after. The fact of this traffic stop leaves only two reasonable conclusions about Diaz's state of mind: either he profiled Defendant, engaging in what turned out to be a fruitful fishing expedition, or he was comfortable making a stop at 10:00 p.m. in a part of the city he regularly patrolled. Under either scenario, the Court is loath to allow Diaz to benefit from a scenario he created to infringe on Defendant's Fourth Amendment rights.

In short, none of the factors identified by the Government, alone or together, add up to reasonable suspicion that Defendant was armed and dangerous when he was stopped. Instead, they show exactly what Diaz said both at the scene of the stop and during his testimony at the evidentiary hearing: that Defendant, in the past, had a "propensity" to carry a firearm. But one's past criminal propensities are precisely what cases like *Jerez* and *Walden* exclude as a basis for reasonable suspicion. Officers needed, but lacked, more to frisk Defendant, rendering the search unconstitutional.

**B.      *Inevitable Discovery does not Save the Evidence***

As a fallback position, the Government argues that the constitutionality of the pat-down search is irrelevant because the doctrine of inevitable discovery applies. The inevitable discovery exception to the exclusion of illegally obtained evidence "permits the introduction of evidence that eventually would have been located had there been no error." *United States v. Jones*, 72 F.3d 1324, 1330 (7th Cir. 1995). If the government can prove by a preponderance of the evidence that officers ultimately would have discovered the challenged evidence, the evidence remains admissible. *Nix*

*v. Williams*, 467 U.S. 431, 444 (1984); The government must show that officers would have obtained an independent legal justification for conducting a search that would have led to the discovery of the evidence, and that officers would have conducted a lawful search without the challenged conduct. *United States v. Pelletier*, 700 F.3d 1109, 1116 (7th Cir. 2012); *United States v. Marrocco*, 578 F.3d 627, 637-38 (7th Cir. 2009).

The Government advances two bases for inevitable discovery, and the Court rejects both. First, it argues that Defendant made a "furtive movement" when he reached for his pockets upon exiting the vehicle. As noted above, the Court rejects this argument because it finds that no furtive movement occurred. Nor was Defendant nervous or evasive. *See United States v. Gordon*, 231 F.3d 750 (11th Cir. 2000). Rather, Defendant was consistently cordial and cooperative in his interaction with the officers. Nothing about Defendant's interaction with Officers Hayes and Gynn provided any reasonable suspicion that Defendant was armed, and that interaction cannot save this pat-down search.

Finally, the Government argues that Lobo's alert on the center console would have given the officers the right to search Defendant, relying on *United States v. Anchondo*, 156 F.3d 1043 (10th Cir. 1998). The problem, as the Court sees it, with the Government's argument is that it misunderstands the nature of Lobo's search. "It is well-established a dog sniff of a vehicle's exterior only for illegal drugs during a lawful stop for a traffic violation does not infringe Fourth Amendment rights, even absent reasonable suspicion of drugs." *United States v. Lewis*, 920 F.3d 483, 491 (7th Cir. 2019). But Lobo didn't conduct a free air sniff of the exterior Wrangler, at least not one that uncovered anything. Instead, with Defendant detained and out of the vehicle, he searched the interior of the car.

A dog search of the interior of a vehicle is permissible only when officers have probable cause to search the vehicle or where the dog, without the involvement of its handler, "instinctively" jumps into the vehicle. *United States v. Guidry*, 817 F.3d 997, 1005–06 (7th Cir. 2016). The Government does not argue that either was present here. Lobo's search, then, was just as illegal as the pat-down. It cannot support inevitable discovery.

The Court has tried to, but cannot, think of any other reasonable explanation for the search of the vehicle's interior that would support the Government's inevitable discovery claim. Under *United States v. Vaccaro*, 915 F.3d 431 (7th Cir. 2019), officers can conduct an "officer safety" search of a vehicle, even while a suspect is detained, if "the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id*. at 436 (quoting *Michigan v. Long*, 463 U.S. 1032, 1049–50 (1983)). But, as explained above, the Court finds no basis for believing that Defendant was armed or dangerous apart from the illegally obtained firearm and ammunition evidence.

Similarly, if an officer has probable cause to arrest, he also may conduct a search incident to that lawful arrest without any added justification. *United States v. Paige*, 870 F.3d 693, 700 (7th Cir. 2017). But Defendant's only arrestable offense was the firearm possession, so it cannot be said that the firearm would have been discovered through a search arising out the possession of that firearm.

In short, Defendant's firearm was discovered, and could have only been discovered, via means that violate the Constitution. The pat-down search was not based on reasonable suspicion that Defendant was armed, and no after-the-fact rationalization would result in any of the

responding officers finding the firearm via legal means. The search of Defendant's person violated the Constitution and the evidence seized from that search must be suppressed. *United States v. Wilbourn*, 799 F.3d 900, 910 (7th Cir. 2015); *see also Wong Sun v. United States*, 371 U.S. 471, 484–86, (1963).

## III.   Conclusion

For these reasons, the Motion to Suppress (ECF No. 28) is GRANTED.

SO ORDERED on August 8, 2023.

s/Holly A. Brady
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT
